Florence S. Doughton, Appellant, v. Marland Refining Company, Employer, United States Fidelity and Guaranty Company, its Insurer, and Peerless Repair Company, Employer, and Employers' Casualty Company, its Insurer.—53 S. W. (2d) 236.

Division Two, September 28, 1932.

*James F. Getty, Henry L. Jost* and *Mord M. Bogie* for appellant.

*Hackney & Welch* for respondents.

COOLEY, C.—This is an appeal by claimant Florence S. Doughton, widow of Lewis Doughton deceased, late of Kansas City, Missouri, from the judgment of the Circuit Court of Buchanan County affirming an award made by the Workmen's Compensation Commission which denied Mrs. Doughton's claim for compensation for the death of her husband. Doughton died January 18, 1929. It is claimed his death resulted from injuries received in an automobile collision which occurred January 10, 1929, claimant's theory being that Doughton was thrown against the windshield of the car, his head striking and breaking the glass, producing an injury to the brain which caused his death. The widow filed with the Workmen's Compensation Commission her claim for compensation, alleging that her husband died as the result of injuries received while in the performance of his duty as servant of both the Peerless Repair Company and the Marland Refining Company. The claim was first heard by Commissioner James who, after hearing the evidence, made an award on October 24, 1930, denying compensation. At the request of claimant the claim was thereafter submitted to and heard by the whole commission which, on January 5, 1931, made an award denying compensation and affirming the award theretofore made by Commissioner James. On appeal to the circuit court the award of the Commission

.was affirmed and claimant appealed to this court. The amount claimed, $8,800, gives this court jurisdiction.

Omitting caption and formal portions, Commissioner James' award was as follows:

"The above parties having submitted their disagreement or claim for compensation for the above accident to the undersigned member of the Missouri Workmen's Compensation Commission, and after hearing the parties at issue, their representatives, witnesses and evidence, the undersigned hereby finds in favor of the above employer and insurer and against the above defendant and awards no compensation for the above accident.

"For the reason that dependent failed to prove that Lewis Doughton died as a result of injuries alleged to have been received on January 10, 1930 (1929?), while he was in the course of his employment with the Peerless Repair Company and compensation against the Marland Refining Company and their insurers is denied for the reason that Lewis Doughton was not employed by the Marland Refining Company on January 10, 1930 (1929?).

"Attached hereto are the findings of fact and rulings of law made in connection herewith."

The attached findings of fact were in the form of questions and answers. After finding that there was an accident January 10, 1929, near St. Joseph, Missouri; that the employee was then in the employ of Peerless Repair Company; that the accident arose out of and in the course of the employment, both employer and employee having elected to accept the Compensation Act, and that the employer's liability was insured by the Employers' Casualty Company, the Commissioner found: "11. Did accident cause death? No." After the foregoing the following appears in narrative form under the caption "statement of facts and rulings of law."

"On January 10, 1929, Lewis Doughton was employed by Peerless Repair Company at a salary of $44 per week. On said date the Peerless Repair Company sent Doughton to St. Joseph, Missouri, to make an inspection of the Marlin (Marland?) Refining Company plant. While en route to St. Joseph the car in which Doughton was riding collided with another car about eight miles south of St. Joseph, Missouri.

"Florence S. Doughton, widow of Lewis Doughton, makes claim for compensation alleging that Lewis Doughton died on January 18, 1929, as a result of injuries received in the accident of January 10, 1929.

"The claimant failed to prove that Lewis Doughton died from injuries received on January 10, 1929, and further there is not sufficient competent evidence to base a finding that Lewis Doughton received an

injury in the accident of January 10, 1929, and compensation is denied.

"The evidence shows and this commission finds that Lewis Doughton was not employed by the Marlin (Marland?) Refining Company on January 10, 1929, and the claimant is awarded nothing by this proceeding and the Marlin (Marland?) Refining Company and the United States Fidelity and Guaranty Company their insurers, are discharged of and from all liability on the cause."

The award of the full Commission, omitting caption and signatures, was as follows:

"The above parties having submitted their disagreement or claim for compensation for the above accident to the undersigned Members of the Missouri Workmen's Compensation Commission, and after hearing the parties at issue, their representatives, witnesses and evidence, the undersigned hereby find in favor of the above employer and insurer and against the above dependent and award no compensation for the above accident.

"Affirming on review award dated October 24 1930."

We have set out the Commission's findings and award because of appellant's contention that the award was made upon the ground that the claimant did not make out a prima-facie case such as would entitle her to go to the jury if the case were one tried to a jury. For reasons which will hereinafter appear we consider the award as based upon a finding of the facts against the claimant on the evidence and the decisive question is whether or not there was sufficient competent evidence to warrant making the award. Complainant's evidence tended to show the following:

Peerless Repair Company is the trade name under which one W. R. Bump conducted, at Kansas City, Missouri, a plumbing, heating and repair business. At the time of his alleged injury Lewis Doughton was and for seven or eight years had been a regular employee of said repair company. The Marland Refining Company had a heating plant at St. Joseph, Missouri, and desired to have an inspection and survey made thereof with the view of reducing expense of operation. For that purpose one L. D. Martheny, a representative of the Marland Company, arranged with the Peerless Company, as the Commission found, to send Doughton to St. Joseph to make the survey, Martheny to take him to St. Joseph and bring him back to Kansas City. Martheny and Doughton made the trip on January 10, 1929, in a Buick roadster automobile owned and driven by Martheny. They started from Kansas City about ten o'clock in the morning. The accident in which it is claimed Doughton was injured, occurred on the way from Kansas City to St. Joseph about eight miles south of the latter place. Martheny, called by complainant, was the only

witness at the hearing who saw the accident. According to his testimony he and Doughton met an automobile driven by one Libel. The road was slippery and as the two cars neared each other Libel's car "skidded" across the road in front of Martheny's car. Martheny did not apply his brakes, fearing to do so would make his car skid over the embankment on which the road ran but removed his foot from the accelerator. His car, traveling about twenty miles per hour at the moment of the impact, collided "head on" with the side of Libel's car. Martheny said the collision "shattered" the radiator and he thought bent the front axle of his car and that it broke out the windshield completely. "It tore a hole in the side of the body of Mr. Libel's car, also tore up his running board, broke his glass." Martheny, driving, was not thrown forward against the steering wheel nor in any wise injured. He immediately asked Doughton if he was hurt. The latter said: "I don't know." They got out of the car and Doughton "examined himself" and said he was not hurt. They then went to the Libel car, learned that none of its occupants had been injured, and both assisted Mr. Libel to push his car out of the way. At the time of the collision Doughton was seated beside Martheny, his feet resting upon the floor boards of the car which sloped upward at an angle "something like forty-five degrees" and his head two and a half feet or more from the windshield. Martheny at first said that Doughton was not thrown against the windshield. On further examination he qualified that statement by saying he did not know whether Doughton's head "struck the car" or not as he was watching the car in front of him, but that he did not see Doughton strike the car or windshield or observe any forward movement of his head or body. Later he said the windshield was broken "by the impact striking of the cars." He looked at Doughton carefully for signs of injury. There were no cuts or signs of injury upon him that he could see.

Martheny's car was not so damaged but that it could be and was driven on to St. Joseph and thence back to Kansas City without repairs. As they proceeded to St. Joseph after the collision Martheny and Doughton discussed the accident, congratulating each other that both had escaped injury, Doughton again saying he was not hurt. They arrived at St. Joseph about noon and Doughton spent the afternoon inspecting the heating plant. He ate "a good lunch." About six or seven o'clock that evening, Doughton having completed his survey of the heating plant, the two men returned to Kansas City where Doughton got out of the car some three miles from home, Martheny proceeding to his own home. How Doughton went from that point to his home is not shown, but presumably by street car. During all that time Doughton had made no complaint of having been

hurt in the collision or of not feeling well and Martheny observed no indications of injury about him. Martheny did not again see Doughton but several days later called his home by telephone to inquire when a report of the survey would be made. Mrs. Doughton informed him her husband was ill but said nothing of his having received an injury. Martheny talked with Doughton also over the telephone and the latter said he had been too ill to make the report, saying "I believe I can do it tomorrow," but nothing about having been injured.

Mrs. Doughton testified that when her husband came home on the night of January 12 she noticed nothing unusual in his appearance but that in the night, about one o'clock A. M., he woke "groaning and saying: 'My head, my head;' " that she laid her hand on his forehead and he flinched and she pushed his hair back and saw a small bruise about an inch in diameter near his right eye. A son of the deceased and Dr. Gloyne, complainant's witnesses, testified to seeing the bruise later, the son locating it on the forehead near the hair line and the doctor above the hair line. Complainant's evidence tended to show that prior to January 10, 1929, Doughton appeared to be in good health and had not complained of pains in the head; that he occasionally missed a day or so from work and had been off duty for about a week immediately preceding January 8, but he had only had a cold and the "flu" being prevalent she did not want him to go to his work; that, moreover, she had some work she desired him to do at home and he remained at home that week at her request.

Doughton remained at home after the accident. He was not confined to his bed all the time, being "up and down" but in bed more each succeeding day until the 17th when he sank into a coma, dying the next day. During that time he suffered severely and increasingly from pains in the head.

Dr. Gloyne, for claimant, testified that he was called about five days before Doughton's death, which would be about January 13. It was then he discovered the bruise which he described as a slight contusion to the scalp about the size of the palm of a small hand, above the hair line. He was permitted, over defendants' objections, to testify that Doughton told him he had been thrown against the windshield in the collision. He gave it as his opinion that Doughton's death was due to "cerebral hemorrhage with edema of the brain," caused by external violence—traumatism. He knew that Doughton had a "history of brain tumor," having had an operation for removal of such tumor about two and a half years previously and to satisfy himself as to the cause of death before making out the death certificate, not being himself a pathologist, he caused an autopsy to be performed. The evidence showed that the operation above referred to had been performed by Dr. Cushing of Boston, a noted brain surgeon, in November, 1926.

Dr. Cushing's deposition was taken by complainant. He testified that Doughton then had a "tumor of the pituitary body" in the brain which was pressing upon the optic nerve and that he removed part of said tumor, enough to relieve the pressure on the optic nerve; that the tumor was not malignant; that such a tumor might continue to grow slowly "or it might even become stationary." If it produced death it would be by a slow, gradual process. In answer to hypothetical questions, over defendants' objections that they were improper, he testified in effect that in his opinion Doughton's death under the circumstances detailed, was due to an injury.

The autopsy was performed by Dr. Gard who was connected with the pathological department of the University of Kansas under Dr. Wahl, dean of the medical school and professor of pathology of said university. The brain, with the lower part of the skull from which it had not been removed, and certain of the internal organs of deceased were submitted to Dr. Wahl for examination. Dr. Gard did not testify at the hearing but the parties had his written report which was used in the examination of the medical witnesses.

Dr. Wahl was called by the defendants. He testified that he found a cancerous tumor the size of a small hen's egg "in the middle of the base of the brain," about midway from front to rear of the head; that "it passed up the middle portion of the brain, pushed the various parts around to the side, had not actually torn but squeezed and pushed to one side (the brain substance) and that produced a number of changes in the cavities of the brain—these cavities we call ventricles—and the ventricles were considerably dilated and produced a condition we call hydrocephalus;" that he could find nothing "that would definitely point to trauma" and no evidence that deceased had received a blow on the head; that before he dissected the brain he discovered no evidence of hemorrhage in that organ but upon dissection he found a hemorrhage in the "brain stem," slight, only two or three drops, but "very important location," "a drop of blood in there is enough to cause death;"that it was not the type of hemorrhage usually found in cases of trauma or accidental injury, the type usually following an injury being near the surface of the brain while this was "deep down in the substance;" that while a blow might cause such hemorrhage as he had found he thought a blow of sufficient force to do so would cause immediate pain and disturbance of the cerebral function, and "owing to the fact that this hemorrhage was very deep seated, I would expect an unusually severe blow and produce lesion," of which he found no evidence. On cross-examination he said that a blow sufficient to cause the hemorrhage would not necessarily produce such lesion. He further testified that the cancerous tumor could have and from his examination he thought had caused the

hemorrhage; that said tumor was sufficient of itself "without any outside interference" to have caused deceased's death at the time he died; that deceased could certainly not have lived more than a few months and witness would expect a tumor of that kind to "upset conditions and start death most any time" without the intervention of "any outside trauma;" that had he not been told of the alleged injury he would not have suspected trauma but from examination of the brain "I would attribute immediate cause of death to hemorrhage which in turn was brought about by the presence of the tumor." He stated on cross-examination that he could not say positively that the tumor alone caused death; that a man with such a tumor would be more susceptible to fatal results from a blow such as was described than a normal person; that if one having such tumor received a violent blow on the head it would be likely to cause a hemorrhage which if of sufficient extent could cause death; and that assuming the facts which complainant's evidence tended to show, as stated in a hypothetical question, he could not give a positive opinion that the tumor "caused his death, at the time of his death," and could not say with certainty that the assumed "blow or shock or jar" did not cause it. On re-direct examination he repeated that when he saw and examined the tumor he knew it was sufficient to have caused the death.

Dr. Regier, for defendants, testified that he was called by Dr. Gloyne to examine Doughton and consult with Dr. Gloyne on January 16, three days after the latter had first been called to see him. He found no bruise or "evidence of any trauma," and Dr. Gloyne did not call his attention to anything of the kind. The patient complained of stiffness of the neck and pain or injury to the right cheek bone. He discovered no objective symptoms.

■■ I. We do not agree with appellant's contention that the Commission's finding and award, which we have set out above, amounts only to a ruling that the complainant did not make out a prima-facie case. We think it was intended to and does constitute a finding for the employer and against the claimant on the whole evidence with an award based on such finding. By statute, Section 3349, Revised Statutes 1929, proceedings before the Commission are to be "simple, informal and summary, and without regard to the technical rules of evidence, and no defect or irregularity therein shall invalidate the same." In practice the Commission does not sustain demurrers to complainants' evidence. It hears all the evidence either party may have to offer and bases its findings and award upon the whole evidence, which of course requires determination of the weight and credibility

of conflicting evidence, the drawing of permissible inferences from proved facts, etc., as would be done by a jury in determining the facts. Section 3339, Revised Statutes 1929, contemplates that, with its award, the Commission shall make and file "with the record of proceedings," a statement of the facts found by it. That means the ultimate facts, not evidentiary facts upon which the ultimate facts depend. [Leilich v. Chevrolet Motor Co. (Mo.), 328 Mo. 112, 40 S. W. (2d) 601, 604.] It has been held that even though the Commission has stated only a legal conclusion rather than a finding of fact its award will not be reversed if its conclusion is supported by sufficient competent evidence (Waring v. Met. Life Ins. Co. (Mo. App.), 39 S. W. (2d) 418, 423; Metting v. Lehr Constr. Co. (Mo. App.), 32 S. W. (2d) 121) which question is to be determined from the facts taken in the light most favorable to the conclusion of the Commission. [Metting v. Lehr Constr. Co., supra. See, also, for effect of a general finding, State ex rel. Buttiger v. Haid et al. (Mo.), 51 S. W. (2d) 1008.]

In Leilich v. Chevrolet Motor Co., supra, the controverted questions were whether or not deceased's death was accidental and if so whether or not the accident arose out of and in the course of his employment. The Commission's finding of facts was in the form of questions and answers, thus: "1. Was there an accident? Yes. . . . 5. Did accident arise out of and in the course of employment? Yes." The court held (328 Mo. 112, 40 S. W. (2d) 604):

"That there was an accident, as defined by the Act, and that it arose out of and in the course of employment, were findings of fact, and not conclusions of law; they were ultimate facts, and, with other constitutive facts found or admitted, afforded a sufficient basis under Section 3 of the Act (Sec. 3301, R. S. 1929) for an award of compensation."

On the same principle the finding in this case, "Did accident cause death? No," is a finding of fact and if supported by substantial evidence affords a basis for the Commission's award denying compensation.

In Waring v. Met. Life Ins. Co., supra, it was contended that the disability claimed was the result not of accident but of a diseased physical condition. The claimant's evidence tended to show that he had had an accident in the course of his employment and that his disability resulted therefrom. Contra, there was evidence tending to show that the disability was not due to the alleged injury. The Commission's finding was that "Employee has failed to prove from the evidence that his disability is caused from an accident arising out of and in the course of his employment." The court said that technically that was not a finding of facts but merely a statement of conclusions but held, as we have above indicated, that the award should not be

reversed on that account if supported by sufficient evidence and in determining that point said there was ample evidence supporting the claimant's theory of his disability but that there was also evidence to the contrary; that:

"The testimony was conflicting as to the cause of plaintiff's disability, and we must assume that the commission, sitting as a jury, determined that question of fact adversely to plaintiff's claim. The decision of the commission upon a question of fact, in the absence of fraud, is final and conclusive. It cannot be disturbed by any appellate court if there is any evidence to support it. [Section 3342, R. S. 1929.] In this respect it is like the verdict of a jury. . . . There was sufficient competent evidence to warrant the making of the award (denying compensation)." [39 S. W. (2d) l. c. 424.]

Obviously, and we think correctly, the court in the Waring case treated the Commission's conclusion as based upon the whole evidence rather than as a holding that the complainant had not made a prima-facie case. And we think the Commission's conclusion in the instant case, that "the claimant failed to prove that Lewis Doughton died from injuries received on January 10, 1929," should be so treated. If there is sufficient competent evidence in the record to sustain that conclusion and the Commission's finding that the accident did not cause deceased's death, the circuit court's judgment sustaining the Commission's award must be affirmed regardless of whether or not the Commission was correct in its further conclusion that there was not sufficient competent evidence to justify finding that Doughton received an injury in the accident, because if he did receive some injury it was incumbent upon the claimant to prove that such injury caused his death.

■ II. The finding of the Commission on questions of fact, if supported by substantial evidence, is conclusive. [Sec. 3342, R. S. 1929.] Its "findings and award have the force and effect of the verdict of a jury." [State ex rel. Brewen-Clark Syrup Co. v. Missouri Workmen's Compensation Commission et al. (Mo.), 320 Mo. 893, 8 S. W. (2d) 897, 899; Leilich v. Chevrolet Motor Co., supra; Waring v. Met. Life Ins. Co., supra; Metting v. Lehr Constr. Co., supra; Morris v. Dexter Mfg. Co. (Mo. App.), 40 S. W. (2d) 750.] If there is substantial evidence supporting the Commission's award, the court on appeal will not set the award aside as being against the weight of the evidence. [See Miller v. St. Joseph Transfer Co. (Mo. App.), 32 S. W. (2d) 449; Hammack v. West Plains L. & L. Mut. Cas. Co., 224 Mo. App. 570, 30 S. W. (2d) 650.] In this case if it be conceded that the facts testified to by complainant's witnesses, with such inferences favorable to her as might reasonably be drawn therefrom, would

sustain a finding that deceased suffered some injury in the collision, had the Commission so found, we are inclined to think that a finding to the contrary cannot be said to be without substantial basis in the evidence. And in any event if he did receive some injury there remains the controverted question of whether or not such injury caused his death. Without determining respondents' contention that in order to reach a conclusion favorable to appellant inference must be piled upon inference it is sufficient to say that on the latter question there was evidence both ways. That deceased had a tumor in his brain is clearly shown. Respondents' evidence was positive that it was malignant. Dr. Wahl testified that it alone was sufficient to cause deceased's death and it is clear from his testimony that in his opinion the death at the time it occurred was attributable to such tumor. It is true there was other expert evidence from which it could be found that the injury, if deceased received one, was the immediate cause of his death. But it is not sufficient for recovery to show that the injury or death complained of resulted from one or the other of two causes for one of which but not the other the defendant would be liable. The plaintiff must produce evidence from which it may reasonably be found that such injury or death resulted from the cause for which the defendant would be liable. If the evidence is such as to authorize a finding either way and the triers of the facts find against the plaintiff's claim, that finding is necessarily conclusive on appeal. So in this case if there is substantial evidence in support of the Commission's finding on this issue it matters not that there may be evidence which would support a finding thereon for claimant had the Commission so found. We think it clear that there is substantial evidence to support the finding and award of the Commission. Therefore the judgment of the circuit court affirming the award must be and it is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.